1

2

3

4                       UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7     PAMELA MARIE SNYDER,                    Case No.  15-cv-04228-KAW

8                    Plaintiff,

9           v.                               **ORDER RE MOTIONS IN LIMINE,**
                                             **DAUBERT MOTIONS, AND MOTION**
10    BANK OF AMERICA, N.A., et al.,          **TO BIFURCATE**

11                   Defendants.             Re: Dkt. Nos. 289-295, 297

12

13          On September 17, 2015, Plaintiff Pamela Marie Snyder filed this case against Defendant

14    Bank of America, N.A., asserting that Defendant mishandled her loan as to a 4-unit property

15    located in San Francisco, California ("Subject Property").  Plaintiff defaulted on her mortgage

16    payments in December 2008 and has not made a payment since.[1]  (Def.'s Mots. in Limine, Exh. 5,

17    Dkt. No. 295-3.)  Following Judge Laporte's January 26, 2018 order on Defendant's motion for

18    summary judgment, the only remaining claims are for "intentional and negligent misrepresentation

19    claims with respect to written representations that the loan modification offers were in compliance

20    with the National Mortgage Settlement" ("NMS").  (Laporte Summ. J. Order at 29, Dkt. No. 151.)

21          The first loan modification offer was made on February 22, 2013, when Defendant offered

22    Plaintiff a Trial Payment Plan ("TPP") which required that Plaintiff make three payments of

23    $7,640.23 beginning on April 1, 2013.  (Def.'s Mots. in Limine, Exh. 10.)  If Plaintiff successfully

24    completed the TPP, she would have received a principal reduction on her loan of $1,003,478.57.

25    (*Id.*)  Plaintiff, however, did not make any payments under the February 22, 2013 TPP.  (Laporte

26    Summ. J. Order at 3.)  On May 15, 2013, Plaintiff received a letter from Defendant, stating that

27    _____

28    [1] As of 2013, Plaintiff was $532,299.13 in arrears on her loan and had a principal balance of
      $1,724,526.98.  (*See* Laporte Summ. J. Order at 4, Dkt. No. 151.)

United States District Court
Northern District of California

1    Plaintiff's loan had been removed from consideration for an NMS loan modification.  (Def.'s

2    Mots. in Limine, Exh. 11.)

3         On May 28, 2013, Plaintiff appealed the denial of an NMS loan modification.  (Laporte

4    Summ. J. Order at 3.)  On June 4, 2013, Plaintiff was offered a second TPP, which required that

5    Plaintiff make three payments of $6,200 beginning on July 1, 2013.  (Def.'s Mots. in Limine, Exh.

6    12.)  Successful completion of the TPP would have resulted in a principal reduction of

7    $1,003,478.57.  (Id.)  Again, Plaintiff did not make any payments under the June 4, 2013 TPP.

8    (Laporte Summ. J. Order at 3.)  Plaintiff appealed the second TPP, but was informed by letter on

9    July 25, 2013 that her appeal was closed because she had withdrawn her request for a loan

10   modification by telephone on July 11, 2013.  (Id. at 3-4.)  In September 2013, the servicing of

11   Plaintiff's loan was transferred to Nationstar.  (Def.'s Mots. in Limine, Exh. 9.)

12        On July 14, 2020, the Court scheduled a pretrial conference for October 8, 2020.  (Dkt. No.

13   274.)  Pretrial statements, motions in limine, and *Daubert* motions were due by September 15,

14   2020, and oppositions and objections were due by September 25, 2020.  (Id.)  On July 20, 2020,

15   the Court issued a case management and pretrial order, reiterating the motion deadlines and setting

16   a reply deadline of September 30, 2020 for the *Daubert* motions.  (Dkt. No. 279 at 5.)

17        On August 31, 2020, Plaintiff filed an ex parte application to continue the deadlines.  (Dkt.

18   No. 286.)  On September 10, 2020, the Court denied Plaintiff's ex parte application as to the

19   motions in limine and *Daubert* motions; thus, the motions in limine and *Daubert* motions

20   remained due on September 15, 2020, oppositions were due on September 25, 2020, and replies to

21   the *Daubert* motions were due on September 30, 2020.  (Dkt. No. 288 at 5.)[2]

22        On September 15, 2020, Defendant filed its *Daubert* motions, motions in limine, and a

23   motion to bifurcate the trial.  (Dkt. Nos. 289-295, 297.)  Plaintiff did not file any pretrial motions.

24   On September 16, 2020, the Court reiterated that oppositions were due on September 25, 2020,

25   and replies were due on September 30, 2020.  (Dkt. No. 298.)

26

27   _____

28   [2] The Court has continued the deadlines as to the pretrial statement, pretrial brief, exhibits, excerpts of discovery, and witness lists.  (*See* Dkt. Nos. 288 at 5; 313.)

United States District Court
Northern District of California

Plaintiff did not file any oppositions.[3]  Having considered the filings, the relevant legal authorities, and the arguments made at the October 8, 2020 pre-trial conference, the Court:

- GRANTS Defendant's *Daubert* motion to exclude Thomas Tarter,
- GRANTS Defendant's *Daubert* motion to exclude Jim Nishimura,
- GRANTS Defendant's *Daubert* motion to exclude Rik Liddell,
- GRANTS Defendant's *Daubert* motion to exclude Plaintiff's expert testimony,
- GRANTS Defendant's *Daubert* motion to exclude Saul Rosenberg,
- GRANTS Defendant's *Daubert* motion to exclude Stan Smith,
- GRANTS IN PART AND DENIES IN PART Defendant's motions in limine, and
- DENIES Defendant's motion to bifurcate.

## I.   DAUBERT MOTIONS

In determining whether expert testimony is admissible under Federal Rule of Evidence 702, the district court is charged with performing "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).  This inquiry is "a flexible one," and "[i]ts overarching subject is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission.  The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 594-95.

### A.   Motion to Exclude Thomas Tarter

Defendant moves to exclude the opinion and testimony of Thomas Tarter.  (*Daubert* Mot. re Tarter, Dkt. No. 289.)  The Court GRANTS Defendant's motion as unopposed.  Further, the Court finds that Mr. Tarter's opinion must be excluded because it does not satisfy *Daubert*.

First, Mr. Tarter opines about the origination of the loan that Plaintiff received from Countrywide.  (*Daubert* Mot. re Tarter, Exh. 13 ("Tarter Report") at 6.)  The Court excludes this

---

[3] On October 2, 2020 – six days before the pretrial conference – Plaintiff moved to stay and vacate all existing pretrial orders for at least six months.  (Dkt. No. 301.)  On October 6, 2020, the Court denied Plaintiff's motion.  (Dkt. No. 308.)

United States District Court
Northern District of California

1    opinion as irrelevant; the origination of the loan or Countrywide's actions are not relevant to the

2    only remaining claims in this case, *i.e.*, whether Defendant represented that the February 2013 and

3    June 2013 loan modification offers were compliant with the NMS.

4         Second, Mr. Tarter opines as to Defendant's "intent," asserting that Defendant knew the

5    loan modifications were incorrectly calculated. (Tarter Report at 13-14, 16.) The Court

6    previously found that opinions as to Defendant's state of mind were improper, and that "Mr.

7    Tarter is not an expert on this matter." (Dkt. No. 251 at 7.) Further, "[e]xpert testimony as to

8    intent, motive, or state of mind offers no more than the drawing of an inference from the facts of

9    the case. The jury is sufficiently capable of drawing its own inferences regarding intent, motive,

10   or state of mind from the evidence, and permitting expert testimony on this subject would be

11   merely substituting the expert's judgment for the jury's and would not be helpful to the jury."

12   *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 1069, 1077 (D. Or. 2013).

13        Third, Mr. Tarter opines as to how much Plaintiff could have saved if Defendant had

14   offered a compliant NMS offer. (Tarter Report at 13-14.) The Court excludes this opinion

15   because it is not relevant, as it does not go to Plaintiff's damages. Rather, Plaintiff's damages are

16   based on her *reliance* on Defendant's statements that the February and June 2013 loan

17   modification offers were compliant with the NMS. Plaintiff's alleged reliance on these offers did

18   not prevent her from obtaining a compliant NMS offer.

19        Fourth, Defendant seeks to exclude Mr. Tarter from offering testimony regarding the

20   NMS. (*Daubert* Mot. re Tarter at 10.) There is no showing that Mr. Tarter has any specialized

21   knowledge as to the NMS, such that he could be considered an expert on it. *See Lucindo v. Nestle

22   Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1107 (N.D. Cal. 2016) (excluding expert testimony

23   where the expert had no specialized knowledge on the adequacy of the defendant's testing

24   procedures).

25        Finally, Mr. Tarter opines that the February and June 2013 loan modification offers were

26   not compliant with the NMS. The Court excludes this opinion because it is unreliable, as it

27   applies the wrong standards. Specifically, Mr. Tarter states that the NMS required the use of the

28   Home Affordable Modification Program ("HAMP") guidelines. (Tarter Report at 7, 10, 12.)

1    Applying the HAMP Net Present Value ("NPV") calculator, Mr. Tarter calculated that Plaintiff's

2    TPP payment should have been $2,513.  (*Id.* at 12.)

3        Plaintiff's loan, however, was not eligible for HAMP based on the applicable threshold

4    criteria.  To be eligible, the unpaid principal balance of the mortgage loan cannot be greater than

5    $1,403,400; Plaintiff's unpaid principal balance was $1,724,526.98 as of November 1, 2008.  (*See*

6    *Daubert* Mot. re Tarter, Exh. 4; MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR

7    SERVICERS OF NON-GSE MORTGAGES VERSION 4.0 at 57 (Aug. 17, 2012), *available at*

8    https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_40.pdf.[4])  When

9    HAMP does not apply, the NMS requires that servicers "shall design proprietary first lien loan

10   modification programs that are intended to produce sustainable modifications according to

11   investor guidelines and previous results."  (*Daubert* Mot. re Tarter, Exh. 17 ("NMS") at § IV.I.2.)

12       At his deposition, Mr. Tarter conceded that Plaintiff's loan was not a HAMP loan.

13   (*Daubert* Mot. re Tarter, Exh. 16 ("Tarter Dep.") at 52:25-53:3.)  Mr. Tarter also conceded that

14   there was a different calculation in computing income.  (Tarter Dep. at 53:4-9.)  Regardless, Mr.

15   Tarter used the HAMP calculation, which requires that "[t]he monthly net income or loss on a

16   rental property . . . should be 75 percent of the monthly gross rental income . . . reduced by the

17   post-modification monthly mortgage payment . . . ."  (Tarter Report at 12; HANDBOOK FOR

18   SERVICERS OF NON-GSE MORTGAGES VERSION 4.0 at 86.)  Defendant, however, was permitted to

19   apply its own loan modification guidelines, and there is no suggestion that these guidelines were

20   noncompliant with the NMS or that Defendant failed to properly calculate Plaintiff's income

21   under the guidelines.  Thus, Mr. Tarter's conclusion that the February and June 2013 loan

22   modification offers were not compliant with the NMS is based on the use of inapplicable

23   standards.  *Compare with Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 243 (D. Conn.

24   2017) (excluding expert testimony where the expert's "report was permeated with critical errors,"

25   including "appl[ying] inapplicable standards in reaching his conclusion").

26

27   [4] The unpaid principal balance limit was still $1,403,400 as of the January 6, 2016 handbook.  (*See*
     MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR SERVICERS OF NON-GSE MORTGAGES

28   VERSION 5.0 at 63 (Jan. 6, 2016), *available at*
     https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_5.pdf.)

United States District Court
Northern District of California

Mr. Tarter also suggests that Defendant should have calculated the loan modification offers based on the "correct" 2013 property value, *i.e.*, the $385,000 opined by Plaintiff. (Tarter Report at 12.) As discussed below, this estimate is not reliable and does not satisfy *Daubert*. Further, as Defendant points out, Mr. Tarter did not calculate whether a loan modification offer that required the loan to be written down to $385,000 would result in a positive NPV. (*Daubert* Mot. re Tarter at 12; Tarter Dep. at 84:14-15.) The NMS, however, only requires that the servicer offer a loan modification if the loan modification would have a positive NPV and meet other investor, guarantor, insurer, and program requirements. (NMS § IV.A.2.) This further shows that Mr. Tarter's opinions are not based on applicable standards and are, therefore, not relevant or reliable. Accordingly, the Court GRANTS Defendant's motion to exclude Mr. Tarter.

### B.     Motion to Exclude Pamela Snyder

Defendant moves to exclude Plaintiff's opinions and testimony in her capacity as an expert witness. (*Daubert* Mot. re Snyder, Dkt. No. 290.) Again, the Court GRANTS Defendant's motion as unopposed. Further, the Court finds that Plaintiff's expert testimony must be excluded because it does not satisfy *Daubert*.

First, the Court agrees with Defendant that Plaintiff's testimony as an expert would be more prejudicial than probative. (*See Daubert* Mot. re Snyder at 11-12.) Plaintiff's "expert" opinions are highly self-serving, as Plaintiff has a personal interest in demonstrating that the February and June 2013 loan modification offers were not compliant with the NMS, as well as her assertion that the Subject Property was worth only $385,000. Moreover, to allow Plaintiff to testify as both a plaintiff and expert witness (and potentially as her own advocate at trial) "would be unfairly prejudicial, misleading and confusing to the jury." *Kranis v. Scott*, 178 F. Supp. 2d 330, 334 (E.D.N.Y. 2002).

Even if Plaintiff's testimony as an expert would not be confusing, the Court also agrees with Defendant that Plaintiff lacks the qualifications and experience required to be an expert witness on the NMS, loan servicing, origination of loans, or credit reporting. (*Daubert* Mot. re Snyder at 6.) Plaintiff does not state she has any relevant professional experience or training regarding these subjects. (*See Daubert* Mot. re Snyder, Exh. 12 ("Snyder Report") at 1-4.)

Rather, Plaintiff asserts that she has experience representing, developing, and selling real estate, as well as preparing residential loans.  (Snyder Report at 1-2.)  Experience in real estate does not make her an expert in loan servicing or credit reporting.  *See Lutron Elecs. Co., Inc. v. Crestron Elecs., Inc.*, 970 F. Supp. 2d 1229, 1241 (D. Utah 2013) ("[E]xpertise in one subject does not necessarily mean the expert will be qualified to testify on all issues that could arise from that subject.").  Likewise, the fact that Plaintiff has reviewed the NMS and government reports or communicated with government or bank officials does not make her an expert in the NMS, particularly when those consultations were, as Plaintiff admits, "very specifically to [her] loans." (*Id.* at 2-3.)  Plaintiff's litigation of her own cases also does not make her an expert.  (*Id.* at 4.) Finally, there appears to be no relevant experience as to credit reporting.  Accordingly, the Court finds that Plaintiff is simply not qualified to be an expert witness on these subjects.

Furthermore, Plaintiff's specific opinions are not relevant or reliable.  With respect to Plaintiff's opinion regarding the NMS and loan modification, this opinion is almost **entirely** copied and pasted from Mr. Tarter's report, with changes from third-person to first-person. (*Compare* Snyder Report at 7-17 *with* Tarter Report at 6-16; *see also Daubert* Mot. re Snyder, Exh. 20 ("Snyder Dep.") at 80:19 ("Did I plagiarize some of it? Yes.").)  This not only emphasizes that Plaintiff lacks expertise in these areas, but, as discussed above, the Court found Mr. Tarter's opinion did not satisfy *Daubert* as he applies inapplicable standards and fails to calculate the NPV.

As to Plaintiff's opinion that the Subject Property is worth only $385,000, this opinion is based on unreliable methodology.[5]  Plaintiff prepared a "Comparative Market Analysis" on March 21, 2013, which she attaches to her report.  (Snyder Report, Exh. Z.)  Plaintiff selects five comparable properties, the lowest of which sold for $707,000 in 2013.  (*Id.* at 4.)  Plaintiff nevertheless opines that the Subject Property is worth $385,000 by making downward adjustments to every comparable property of $87,500 because the Subject Property is in a liquification zone, $250,000 for a complete foundation replacement, and $50,000 for renovations to a Subject

---

[5] Further, as Defendant points out, Plaintiff's opinion is contrary to her statement under penalty of perjury that the Subject Property was worth at least $500,000 during the 2012-2013 tax year.  (*See Daubert* Mot. re Snyder, Exh. 9.1.)

United States District Court
Northern District of California

1    Property unit that is currently uninhabitable.  (*Id.* at 2.)

2            Defendants correctly point to a number of problems with this methodology.  First, the

3    properties do not appear to be comparable.  For example, Plaintiff asserts that the Subject

4    Property's location in a liquefaction zone is significant enough to warrant a $87,500 adjustment to

5    every comparable property, but does not explain why she failed to choose a single comparable

6    property in a liquification zone.  (*See* Snyder Report, Exh. Z at 2.)

7            Second, Plaintiff's downward adjustments are arbitrary and not grounded in fact, rendering

8    them unreliable.  Plaintiff does not explain how she estimated $250,000 for the foundation

9    replacement.  (*See* Snyder Report, Exh. Z at 2.)  Further, it is unclear why Plaintiff can include a

10   downward adjustment for the foundation replacement when the evidence shows Plaintiff has **not**

11   replaced the foundation, and there is no evidence that the replacement was necessary.  (*See*

12   *Daubert* Mot. re Snyder, Exh. 19 ("Dec. 15, 2017 Snyder Dep.") at 95:7-8.)  Similarly, Plaintiff

13   calculates a $50,000 adjustment to renovate a unit, but it is again unclear what basis there is for

14   this amount.  (Snyder Report, Exh. Z at 2.)  Plaintiff also calculates the $87,500 downward

15   adjustment for being in the liquefaction zone as 35% of the foundation replacement cost (*i.e.*,

16   $250,000 x 35% = $87,500), but does not explain the 35% figure.  (*Id.*)  Moreover, it appears this

17   would be double-counting the need for a foundation replacement.  As these downward

18   adjustments are unreliable, Plaintiff's methodology and resulting opinion about the value of her

19   property is likewise unreliable and must be excluded.

20           Additionally, Plaintiff's remaining opinions are not relevant to this case.  For example,

21   Plaintiff opines to the origination of the loan, which is not at issue in this case.[6]  (*See* Snyder

22   Report at 7.)  Plaintiff also opines as to the effect on her credit report, which is not a damage that

23   was incurred in reliance on the February and June 2013 loan modification offers, but was the

24   result of her failure to pay her mortgage since December 2008.  (*Id.* at 10.)  Plaintiff's opinions as

25   to a hypothetical compliant loan modification likewise do not go to recoverable damages in this

26   case (and, in any case, were mostly copied and pasted from the Tarter Report).  (*Id.* at 13-14, 17.)

27

28   _____
     [6] This "opinion" is also copied from the Tarter Report.  (*See* Tarter Report at 6.)

United States District Court
Northern District of California

1    Thus, the Court GRANTS Defendant's motion to exclude Plaintiff's expert testimony.

2       **C.    Motion to Exclude Jim Nishimura**

3    Defendant moves to exclude the opinion and testimony of Jim Nishimura.  (*Daubert* Mot.

4    re Nishimura, Dkt. No. 292.)  Once again, the Court GRANTS Defendant's motion as unopposed.

5    Additionally, Mr. Nishimura's opinions must be excluded under *Daubert*.

6    Mr. Nishimura was designated as a real property valuation expert, and opined in June 2018

7    that the Subject Property was worth $399,000 in 2013.  (*Daubert* Mot. re Nishimura, Exh. 7

8    ("Nishimura Report") at 107[7].)  Mr. Nishimura identified six "comparable properties," which were

9    sold for between $707,000 and $1,150,000.[8]  (*Id.* at Attachment ("Nishimura Retroactive

10   Appraisal") at 116-117.)  Mr. Nishimura then made downward adjustments ranging between

11   $404,625 and $664,250 to calculate an adjusted sale price for the comparable properties, which

12   ranged between $192,350 and $485,750.  (*Id.*)

13   As Defendant correctly observes, Mr. Nishimura's methodology is unreliable and,

14   particularly with respect to the downward adjustments, incomprehensible.  As an initial matter,

15   Mr. Nishimura's 2018 opinion that the Subject Property was worth $399,000 in 2013 is

16   contradicted by his November 2016 opinion that the Subject Property was worth $590,000 in

17   2016, despite testifying that the property was noticeably deteriorated in 2016.  (*Daubert* Mot. re

18   Nishimura, Exh. 9 ("Nishimura Dep.") at 102:3-7.)  In other words. Mr. Nishimura opined that the

19   Subject Property was worth more in 2016 than 2013, despite having deteriorated in condition.

20   Such a contradiction renders his opinions unreliable.  *See Tsao v. Ferring Pharms., Inc.*, xx, 2018

21   WL 3649714, at *11 (S.D. Tex. Apr. 19, 2018) (excluding expert testimony as unreliable where it

22   contradicted the expert's own testimony, among other things).

23   Mr. Nishimura's methodology suffers from multiple problems.  For example, Mr.

24   Nishimura assumes that each of the Comparable Properties are in "average" condition, and that

---

[7] Because the Nishimura Report has multiple exhibits with no numbered pages, the Court cites to the ECF header page.

[8] Three of the six properties are identical to those used by Plaintiff.  (*Compare* Nishimura Report at 116 *to* Snyder Report, Exh. Z at 4-5

United States District Court
Northern District of California

United States District Court
Northern District of California

they were in better condition than the Subject Property.  (Nishimura Report at 107.)  This would include, apparently, Comparable Sale #3, a fire-damaged, uninhabitable property.  (*See* Nishimura Report at 140; *Daubert* Mot. re Nishimura, Exh. 13 ("Ringel Rebuttal Report") at 9-10.  It is unclear how a fire-damaged, uninhabitable property would be in better condition than the Subject Property, which was renting out three units for $8,000 in 2013.  Indeed, Mr. Nishimura testified that he made a "mistake" and should have marked the condition of Comparable #3 as "poor," underscoring the unreliability of his methodology.  (Nishimura Dep. at 113:21-25.)

Far more glaring, however, was Mr. Nishimura's downward adjustments.  Mr. Nishimura asserted that, based on bids (including several after 2013) that he never reviewed, it would cost $504,550 to conduct repairs, including replacing the foundation, replacing the roof, painting the exterior, renovating the front and rear stairs, and rehabilitating one unit.  (*Id.* at 147.)  Mr. Nishimura then added a 30% contingency cost to account for delays in the schedule and cost overruns, as well as $42,000 in tenant relocation costs, for a total of $698,000.  (*Id.*)  Mr. Nishimura thus opined it would cost $698,000 to get the Subject Property into "good" condition, and $598,000 to get it to average condition.  (*Id.*)  Mr. Nishimura then applied a downward adjustment based on the "condition" of the comparable property, which reflected the amount of money Mr. Nishimura believed it would take to repair the Subject Property to the same condition as the comparable property.  (*Id.* at 116-117; Nishimura Dep. at 98:6-15.)

To start, the $698,000 estimate is based on bids or repair work that Mr. Nishimura never reviewed.  Rather, Mr. Nishimura testified that Plaintiff told him the work was needed.  (Nishimra Dep. at 99:7-102:1.)  Thus, Mr. Nishimura never independently verified that the work was in fact needed or how much it would cost, but relied on what Plaintiff told him was needed to then estimate the Subject Property's value.  Indeed, Mr. Nishimura's valuation included $320,510 to repair the foundation, although, again, that work has never been done.  (*See Daubert* Mot. re Nishimura, Exh. 3 ("Dec. 15, 2017 Snyder Dep.") at 95:7-8.)  Contrary to *Daubert's* requirement that expert testimony "rest[] on a reliable foundation," Mr. Nishimura's opinion of how much it would cost to get the Subject Property into "good" condition is based solely on information that Mr. Nishimura never reviewed and is unsupported.  509 U.S. at 597; *see also Davis v. Carroll*,

United States District Court
Northern District of California

937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013) ("Where an appraisal or other expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded under Rule 702."); *Powell v. Anheuser-Bush, Inc.*, CV 09-729-JFW (VBKx), 2012 WL 12953439, at *7 (C.D. Cal. Sept. 24, 2012) (excluding expert testimony where the expert failed to consider the relevant underlying facts or develop the factual record).

Even if Mr. Nishimura had a reliable foundation for his $698,000 estimate, Mr. Nishimura also fails to explain the actual downward adjustments applied. Instead, Mr. Nishimura made a $498,000 downward adjustment if the comparable property was in fair-poor condition, a $548,000 downward adjustment if the comparable property was in fair condition, and a $598,000 downward adjustment if the comparable property was in average condition. (Nishimura Report at 116-17.) There is no explanation for why these amounts were chosen. Indeed, Mr. Nishimura's conclusions emphasize how arbitrary these amounts are; with respect to Comparable Sale #3, Mr. Nishimura asserts that it would cost $498,000 to repair the Subject Property – an inhabited, income-generating property – to as good a condition as a fire-damaged, uninhabitable property.

The Court finds Mr. Nishimura's expert report is contradictory to his prior valuation, based on an unreliable foundation, and uses unreliable methodology. Accordingly, his report and testimony must be excluded under *Daubert*.

### D.    Motion to Exclude Rik Liddell

Defendant moves to exclude the opinion and testimony of Rik Liddell. (*Daubert* Mot. re Liddell, Dkt. No. 293.) The Court again GRANTS Defendant's motion as unopposed and because Mr. Liddell's opinions do not satisfy *Daubert*'s requirements.

Like Mr. Nishimura, Mr. Liddell was designated as a real property valuation expert. (*Daubert* Mot. re Liddell at 1.) In June 2018, Mr. Liddell opined that the Subject Property was worth at most $387,500 in 2013. (*Daubert* Mot. re Liddell, Exh. 7 ("Liddell Report") at 107.[9]) Mr. Liddell identified six "comparable properties," which are identical to the properties chosen by

---

[9] Again, the Liddell Report does not have numbered pages, so the Court cites to the ECF header page.

Mr. Nishimura.  (*Compare* Nishimura Report at 116-117 *with* Liddell Report at 113, 116.)  Mr. Liddell also applies near identical downward adjustments as Mr. Nishimura, including a $498,000 downward adjustment if the comparable property was in fair-poor condition, a $548,000 downward adjustment if the comparable property was in fair condition, and a $598,000 downward adjustment if the comparable property was in average condition.  (*See* Liddell Report at 114, 116.) Additionally, like Mr. Nishimura, Mr. Liddell makes no effort to explain how these amounts were chosen.

Accordingly, the Court finds that for the same reasons Mr. Nishimura's opinion does not satisfy *Daubert*, Mr. Liddell's opinion also fails to satisfy *Daubert*.  Mr. Liddell's opinion and testimony are therefore excluded.

### E.    Motion to Exclude Saul Rosenberg

Defendant moves to exclude the opinion and testimony of Dr. Saul Rosenberg.  (*Daubert* Mot. re Rosenberg, Dkt. No. 294.)[10]  The Court GRANTS Defendant's motion as unopposed and because Dr. Rosenberg's opinions do not satisfy *Daubert*'s requirements.

On June 28, 2018, Dr. Rosenberg opined that Plaintiff developed depression and post-traumatic stress disorder ("PTSD") as a result of Defendant's conduct regarding the loan on the Subject Property.  (*Daubert* Mot. re Rosenberg, Exh. 10 ("Rosenberg Report") at 8.) Additionally, on September 27, 2018 – after the August 14, 2018 expert discovery cut-off – Dr. Rosenberg provided Defendant with a Revised Report dated September 25, 2018.  (*Daubert* Mot. re Rosenberg at 5; *see also* Dkt. No. 158 (setting August 14, 2018 expert discovery cut-off deadline).

Defendant requests that the Court strike Dr. Rosenberg's September 25, 2018 report as untimely.  (*Daubert* Mot. re Rosenberg at 17-19.)  The Court GRANTS this request.  Plaintiff has provided no explanation for why Dr. Rosenberg's September 25, 2018 report was prepared after the expert discovery cut-off.

Based on the Court's review of Dr. Rosenberg's June 28, 2018 opinion, the Court finds

---

[10] A mostly unredacted motion is available at Docket No. 321.

United States District Court
Northern District of California

that the opinion is irrelevant because Dr. Rosenberg fails to opine that Plaintiff's psychological harm was caused by the allegedly non-compliant February and June 2013 loan modification offers. (*See Daubert* Mot. re Rosenberg at 7-9.)  Instead, Dr. Rosenberg opines that Plaintiff's psychological harm was caused by Defendant generally, and cites specific examples of harm as Plaintiff becoming socially withdrawn by 2012.  (Rosenberg Report at 3.)  In other words, the harm Dr. Rosenberg relies on for his opinion could **not** have been caused by the 2013 loan modification offers.  Thus, Dr. Rosenberg does not and cannot connect his diagnoses to the only actionable behavior left in this case.

Absent a connection between Dr. Rosenberg's diagnoses and the only remaining claims in this case, Dr. Rosenberg's opinion is irrelevant and likely to be prejudicial, as a jury may conflate his diagnoses that Plaintiff's harm was caused generally by Defendant with whether it was specifically caused by her reliance on the February and June 2013 loan modification offers.  Thus, Dr. Rosenberg's opinion and testimony must be excluded.  *See Daubert*, 509 U.S. at 597 ("Rule 702 . . . assign[s] to the trial judge the task of ensuring that an expert's testimony . . . is relevant to the task at hand.").

### F.    Motion to Exclude Stan Smith

Finally, Defendant moves to exclude the opinion and testimony of Dr. Stan Smith. (*Daubert* Mot. re Smith, Dkt. No. 291.)  Again, the Court GRANTS Defendant's motion as unopposed and not satisfying *Daubert*'s requirements.

First, Dr. Smith opines as to Plaintiff's additional costs from not obtaining an NMS-compliant loan modification offer.  (*Daubert* Mot. re Smith, Exh. 9 ("Smith Report").  These damages are not relevant to the case; again, this case is limited to the alleged misrepresentation that the February and June 2013 loan modification offers were compliant with the NMS. Plaintiff's damages, in turn, are limited to those she incurred *in reliance* on the alleged misrepresentation.  Plaintiff's failure to get an NMS-compliant loan modification offer was not due to her reliance on the February and June 2013 loan modification offers.  Indeed, Dr. Smith himself stated in his report that Plaintiff reported she relied on Defendant's assurances that she would receive an NMS-compliant modification to undertake extensive upgrades, renovations, and

1   improvements to the Subject Property.  (Smith Report at 8.)

2        Additionally, Dr. Smith's opinion relies on inadequate factual foundations and problematic

3   assumptions.  Dr. Smith has no specialized knowledge in the NMS, and admitted that he did not

4   review the NMS.  (*Daubert* Mot. re Smith, Exh. 14 ("Smith Dep.") at 32:14-16.)  Instead, Dr.

5   Smith accepted Plaintiff's statements regarding what an NMS-compliant loan modification offer

6   would require, including the application of HAMP guidelines to calculate income and the

7   $385,000 valuation for the Subject Property.  (Smith Report at 9-10; Smith Dep. at 39:4-13.)  As

8   discussed above, however, neither of these assumptions are valid; there can be no real dispute that

9   the HAMP guidelines did **not** apply to Plaintiff's loan, and the $385,000 valuation for the Subject

10  Property lacks a reasonable foundation.  Thus, Dr. Smith's calculations were based on faulty

11  assumptions, and would not be helpful to a jury.

12        Second, Dr. Smith opines that Plaintiff has incurred $373,235 in lost time.  (Smith Report

13  at 11.)  Dr. Smith based this on Plaintiff's statement that she worked on her mortgage for 32 hours

14  per week from February 2013 through the estimated trial date of February 1, 2019.  (*Id.* at 10.)  He

15  then multiplied this by the mean hourly wage of Paralegals and Legal Assistants in the San

16  Francisco-Redwood City-South San Francisco area, or $38.27 in 2017 dollars.  (*Id.* at 10-11.)

17  Again, this is not time resulting from Plaintiff's *reliance* on the February and June 2013 loan

18  modifications, but is time spent on her mortgage generally, as well as this litigation.  (*Id.* at 10.)

19  Such time includes time spent on matters unrelated to Plaintiff's February and June 2013 loan.

20  Indeed, Defendant stopped servicing the loan in or around September 2013.  (Def.'s Mots. in

21  Limine, Exh. 9.)  Dr. Smith admitted in his deposition that he did not distinguish between the

22  hours that Plaintiff spent dealing with the loan between Defendant and Nationstar.  (Smith Dep. at

23  54:19-23.)  Moreover, it is not clear why Dr. Smith uses the paralegal rate, as Plaintiff was not

24  working as a paralegal at any time between 2013 and 2019.  (*See Daubert* Mot. re Smith at 15.)

25        Finally, Dr. Smith opines that Plaintiff suffered a loss of enjoyment of life between

26  $582,563 and $1,165,124.  (Smith Report at 12, 20.)  Dr. Smith applies a "willingness-to-pay"

27  model, which examines what society is willing to pay to preserve the ability to lead a normal life.

28  (*Id.* at 11.)  This model relies on studies of: (1) consumer behavior and purchases of safety

United States District Court
Northern District of California

14

United States District Court
Northern District of California

devices, (2) wage risk premiums to workers, and (3) cost-benefit analyses of regulations.  (*Id.*)  Dr. Smith calculates the reduction in value of life in this case by first taking "[a]n assumed impairment rating benchmark, based on the interview [with Plaintiff], of a 40 percent to 80 percent reduction in the ability to lead a normal life for 2013 through 2019 . . . ; a 30 percent to 60 percent reduction for 2020; a 20 percent to 40 percent reduction for 2021; a 10 percent to 20 percent reduction for 2022; and a 5 percent to 10 percent reduction for 2023 and thereafter."  (*Id.* at 12.)  Dr. Smith assumes a life expectancy of 84.6 years and a value of a life of $4.8 million.  (*Id.*)

Again, there is no demonstration that this reduction in value of life was the result of Plaintiff's reliance on the February and June 2013 loan modifications, as opposed to other issues – including the fact that Plaintiff had not paid her mortgage since 2008.  For this reason alone, exclusion is necessary.  Further, the Court observes that many courts have rejected Dr. Smith's testimony as to hedonic damages.  In *Smith v. Jenkins*, the First Circuit articulated "serious doubts that the underlying studies actually measure the value of life."  732 F.3d 51, 66 (1st Cir. 2013).[11]  But even assuming the "willingness-to-pay" model "is a reliable of the value of life, it was of no assistance to the jury in calculating [a person]'s loss of enjoyment of life.  As other courts have recognized, the willingness-to-pay studies do not relate in any way to the actual component of damages, the *enjoyment* of life."  *Id.* (internal quotation omitted).  While Dr. Smith "equated the value of life with the value of enjoyment of life . . . it is readily apparent that the two are not the same.  A plaintiff who loses enjoyment of life but is alive is not in the same shoes as a person who lost his life."  *Id.*

To account for this discrepancy, Dr. Smith appears to start with a life value of $5.9 million.  (Smith Report at 17.)  Dr. Smith then assumes "human capital" of $1.1 million to reach a credible net value of life of $4.8 million in 2005 dollars.  (*Id.*)  It is entirely unclear what "human capital"

---

[11] For example, with respect to consumer purchases, the First Circuit observed that spending on safety items can be influenced by both advertising and government-mandated safety requirements, rather than consideration by consumers of how much a life is worth.  *Smith*, 732 F.3d at 66.  As for wage-risk premiums, "to say that the salary paid to those who hold risky jobs tells us something significant about how much we value life ignores the fact that humans are moved by more than monetary incentives."  *Id.* (internal quotation omitted).  Finally, the cost-benefit of government regulations may also go beyond cost-benefit analysis, as the government could have chosen such policies for other reasons.  *Id.*

is or why it is worth $1.1 million.  Dr. Smith further adjusts this to $4.1 million in 2005 dollars, purportedly because he is actually basing his value on a review conducted in the late 1980s, which he then adjusts for inflation over time.  (*Id.*)  Dr. Smith does not explain whether this adjusted-for-inflation number is based on the value of a life or the value of enjoyment of life.  Dr. Smith also does not explain his reliance on the 1980s reviews rather than the numerous other more recent studies that he cites.  The fact that the number is more conservative than what Dr. Smith could have chosen does not render it reliable or scientific.  *Ayers v. Robinson*, 887 F. Supp. 1049, 1060 (N.D. Ill. 1995) (rejecting Dr. Smith's opinion because although he could have chosen a higher number, "a conservative opinion in that sense does not equate to a scientific one").

These are not the only numbers Dr. Smith fails to explain.  There is also no explanation for why Dr. Smith chose the impairment benchmarks he did, other than that they are "based" on an interview one of his staff members had with Plaintiff.  (Smith Report at 12; Smith Dep. at 72:12-20.)  Thus, there is no way of testing Dr. Smith's assumption that Plaintiff's life has in fact been reduced by that impairment benchmark, or if it is an arbitrary number.  This does not satisfy *Daubert*.  For all these reasons, the Court excludes Dr. Smith's opinion and testimony.

## II.    MOTIONS IN LIMINE

### A.    Motion in Limine #1: Evidence of Dismissed Allegations

Defendant moves for an order directing Plaintiff to raise her dismissed claims, as well as her assertions about the origination of the loan.  (Def.'s Mots. in Limine at 4.)

The Court GRANTS Defendant's motion as unopposed.  Additionally, to the extent that such statements or evidence have no relevance to her actionable claims, they are inadmissible.  *See Van v. Language Line Servs., Inc.*, Case No. 14-cv-3791-LHK, 2016 WL 3566980, at *5 (N.D. Cal. June 30, 2016) ("the Court agrees with Defendants that evidence of claims resolved at summary judgment in Defendants' favor is irrelevant").  For example, whether the origination of the loan was problematic does not go to whether Defendant misrepresented that the February and June 2013 loan modifications were compliant with the NMS.  Likewise, statements about Defendant's alleged failure to provide a single point of contact do not go to the merits of the misrepresentation claims.  Such statements or evidence would only confuse a jury, or risk

United States District Court
Northern District of California

United States District Court
Northern District of California

1  prejudicing Defendant if a jury's finding of liability is based not on the claims before them, but on

2  collateral claims that are no longer a part of this litigation.

3  **B.     Motion in Limine #2: Evidence of Defendant's Entry into Consent Judgments or**
   **Previous Litigation**

4

5          Defendant moves to exclude evidence or testimony regarding other litigation filed against

6  or involving Defendant, Defendant's entry into consent judgments other than the NMS, and

7  Plaintiff's claim that her loan is identified in various consent orders.  (Def.'s Mots. in Limine at 6.)

8  For example, Defendant would prohibit Plaintiff from asserting that Defendant entered into the

9  NMS due to its predatory conduct.  (*Id.* at 8.)

10         The Court GRANTS Defendant's motion as unopposed.  Further, there is no apparent

11  relevance of such evidence to whether Defendant did, in fact, misrepresent that the February and

12  June 2013 loan modifications were compliant with the NMS.  Rule 404(b) prevents using evidence

13  of "similar suits brought against Defendant in order to prove that Defendant is guilty of similar

14  conduct in this instance."  *Wright v. Liberty Mut. Fire Ins. Co.*, No. 06-cv-351-RJC-KLM, 2009

15  WL 3334822, at *4 (D. Co. Oct. 13, 2009).  Moreover, any relevance such evidence could have is

16  outweighed by the unfair prejudice of introducing such evidence, as a jury may consider the

17  evidence for an improper purpose or seek to punish Defendant for actions unrelated to the instant

18  litigation.  *See Marine Bargas v. Rite Aid Corp.*, CV 13-3865-MWF (JEMx), 2016 U.S. Dist.

19  LEXIS 200671, at *8 (C.D. Cal. Oct. 26, 2016) (excluding evidence of previous litigation because

20  its probative value was substantially outweighed by the danger of unfair prejudice).

21  **C.     Motion in Limine #3: Evidence of Denials of  Motions for Summary Judgment**

22         Defendant moves for an order directing Plaintiff to not mention that Defendant moved for

23  summary judgment, the arguments of counsel made in the briefs, and the Court's ruling on either

24  motion.  (Defs.' Mots. in Limine at 8.)

25         The Court GRANTS Defendant's motion as unopposed.  Additionally, the Court cannot

26  envision a scenario where Plaintiff could introduce the motions for summary judgment and the

27  Court's ruling thereon for a proper evidentiary purpose.  The Court made no determinations as to

28  the facts; it only found that there was a dispute of facts, which a jury must resolve.  Thus,

introducing the motions for summary judgment and the Court's rulings may cause jury confusion, as a jury may believe the case has merit based solely on the Court's denial of summary judgment. *See Spin Master Ltd. v. Zobmondo Entm't, LLC*, Case No. 06-cv-3459-ABC (PLAx), 2012 U.S. Dist. LEXIS 188155, at *45 (C.D. Cal. Apr. 27, 2012) ("a court's findings on a motion for summary judgment can be excluded if they present a risk of jury confusion and unfair prejudice").

### D.   Motion in Limine #4: Evidence of Plaintiff's Subsequent Handwritten Opinions

Defendant moves for an order to exclude any documentary evidence containing Plaintiff's handwritten notes added after-the-fact. (Defs.' Mots. in Limine at 9.)  For example, Defendant cites a July 16, 2012 letter by Plaintiff, which includes handwritten notes from December 2012, including: "As of this date 12/5/2012 BAC's predatory actions continue . . . ."

In general, such handwritten notes appear to have no evidentiary purpose.  They do not prove anything except that Plaintiff believed Defendant was engaged in problematic practices. Such notes also do not appear admissible to prove the truth of the matter asserted therein.  That said, without knowing what evidence Plaintiff intends to introduce, it appears premature to rule on this motion in limine.  Defendant will have the opportunity to object to the specific exhibits Plaintiff seeks to introduce when trial exhibits are provided to the Court.  Accordingly, the Court DENIES this motion for limine, but with the understanding that these handwritten notes appear irrelevant and inadmissible, and that Defendant may object to the specific evidence accordingly.

### E.   Motion in Limine #5: Evidence of Discovery Dispute

Defendant moves for an order to prevent Plaintiff from presenting evidence of a discovery dispute between the parties, where Plaintiff asserted that certain documents were never provided to her.  (Def.'s Mots. in Limine at 11.)

The Court GRANTS Defendant's motion as unopposed.  Further, there does not appear to be any proper purpose for introducing this discovery dispute; it does not go to the merits of the case. *Van*, 2016 WL 3566980, at *4 (excluding evidence of discovery disputes because the disputes did not bear on the merits of the plaintiff's claims, and were therefore not relevant); *Mformation Techs., Inc. v. Research in Motion Ltd.*, Case No. 08-cv-4990-JW, 2012 WL 2339762, at *2 (N.D. Cal. June 7, 2012) ("Evidence of the parties' discovery disputes are not relevant to the

United States District Court
Northern District of California

questions of patent validity or infringement, and thus should not be presented to the jury.").

**F.     Motion in Limine #6: Evidence of Damages Not Based on Reliance**

Defendant moves to exclude evidence that is not the result of Plaintiff's reliance on the February and June 2013 loan modification offers, including emotional/psychological distress, loss of the value of life, loss of her home, construction costs pre-dating the loan modification offers, negative iterations on her credit report, and increased mortgage costs.  (Def.'s Mots. in Limine at 12.)

The Court GRANTS this motion as unopposed, but only to the extent that the damages are not based on Plaintiff's reliance on the February and June 2013 loan modification offers.  Plaintiff could, for example, seek garden variety emotional distress if she could show it was the direct result of her reliance on the February and June 2013 loan modification offers (assuming a jury finds intentional misrepresentation).  Other damages, such as increased mortgage costs and negative iterations on her credit report, are not recoverable because that was the result of her failure to pay her mortgage starting in December 2008, long before the loan modification offers at issue.  Such damages are irrelevant, and to raise them would risk confusing the jury as to which damages are in fact recoverable.

**G.     Motion in Limine #7: Evidence of Plaintiff's Constructions Costs**

Defendant moves to exclude evidence of Plaintiff's construction costs, *i.e.*, receipts and documents summarizing construction costs.  (Def.'s Mots. in Limine at 14.)  The Court agrees that much of the evidence of Plaintiff's costs is problematic; for example, Plaintiff previously submitted an undated document which summarized work performed and costs from redesigning Unit 1 in the Subject Property.  (*See* Dkt. No. 244-2.)  This work, however, could not have been done in *reliance* of the February and June 2013 loan modification offers because the work was started in **2012**, prior to the offers.  Moreover, it appears this is a summary prepared after the fact, rather than proof that Plaintiff did, in fact, pay the amounts stated in the document.  (*See* Defs.' Mots. in Limine, Exh. 23 ("July 2020 CMC Tr.") at 17:10-18:2.)  Likewise, contractor quotes or bids are not evidence that Plaintiff paid those amounts.

That said, the Court cannot at this point exclude *all* evidence of construction costs.  If

United States District Court
Northern District of California

Plaintiff does, in fact, have receipts of payment that she can testify were incurred in reliance on the February and June 2013 loan modification offers, such evidence could be admissible.[12] Accordingly, the Court GRANTS IN PART Defendant's motion; the Court excludes evidence of contractor quotes or bids, as well as construction that was performed not in reliance on the loan modification offers, including the undated document summarizing work performed from redesigning Unit 1.  (*See* Dkt. No. 244-2.)  Defendant will also have the opportunity to object to any other exhibits Plaintiff seeks to introduce when trial exhibits are provided to the Court.

### H.    Motion in Limine #8: Evidence of Medical Damages and Mugging

Defendant moves to exclude Plaintiff from offering evidence of her "major organ extraction surgery" and her getting mugged when going to City Hall to obtain documents related to the instant case.  (Def.'s Mots. in Limine at 18.)  The Court GRANTS Defendant's motion as unopposed.  Further, these damages are not at issue; they were not caused by Plaintiff's reliance on the February and June 2013 loan modification offers.  Additionally, there does not appear to be a medical expert to testify about Plaintiff's health or Defendant's role in causing those diagnoses. (*Id.* at 19.)

### I.    Motion in Limine #9: Dr. Rosenberg's Revised Report

Defendant moves to exclude Dr. Rosenberg's September 27, 2018 report.  (Def.'s Mots. in Limine at 20.)  The Court GRANTS Defendant's motion as unopposed and because, as discussed above, this report was untimely and must therefore be excluded.

### J.    Motion in Limine #10: Evidence of Defendant's Worth

Finally, Defendant moves to exclude introduction of Defendant's worth during the "liability phase" of the trial.  (Def.'s Mots. in Limine at 22.)  This is in relation to Defendant's motion to bifurcate the trial.  (*Id.*)

The Court DENIES Defendant's motion.  As discussed below, bifurcation is not an efficient use of the Court's resources in this case, particularly when there is a substantial backlog

---

[12] That said, it is unclear to the Court how Plaintiff could have relied on the alleged misrepresentations in incurring constructions costs because it seems she believed the loan modification offers were non-compliant with the NMS.

United States District Court
Northern District of California

of trials due to the COVID-19 public health emergency.  Moreover, it is not clear Plaintiff has any evidence of Defendant's net worth.  The statements Defendant points to are general statements about Defendant being a large banking institution, which is common knowledge.  (*See* Defs.' Mots. in Limine at 23 (citing to Plaintiff's statement in the January 7, 2020 case management conference statement calling Defendant a "crushing power").)  To the extent Plaintiff does have evidence of Defendant's net worth, the Court can provide a limiting instruction requiring the jury to consider such evidence only for punitive damages.  *See Todd v. AT&T Corp.*, Case No. 16-cv-3357-HSG (MEJ), 2017 WL 1398271, at *2 (N.D. Cal. Apr. 19, 2017) ("Even if evidence of a defendant's financial condition is offered in support of [punitive] damages, . . . a limiting instruction may be appropriate.") (internal quotation omitted).  The Court may also instruct Plaintiff to not refer to Defendant's net worth when discussing liability.

### III.     MOTION TO BIFURCATE

Finally, Defendant filed a motion to bifurcate the trial into two phases: (1) liability, and (2) punitive damages.  (Def.'s Mot. to Bifurcate, Dkt. No. 297.)  Defendant asserts that bifurcation is necessary to prevent prejudice from introducing its net worth for any purpose other than punitive damages.  (*Id.* at 6.)

The Court DENIES Defendant's motion.  Rule 42(b) provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the Court may order a separate trial of one or more separate issues, claims, cross-claims, counterclaims, or third party claims."  "Facts to be considered when deciding whether to bifurcate a trial include: complexity of issues, factual proof, risk of jury confusion, difference between the separated issues, the chance that separation will lead to economy in discovery, and the possibility that the first trial may be dispositive of the case."  *MySpace, Inc. v. Graphon Corp.*, 732 F. Supp. 2d 915, 917 (N.D. Cal. 2010).  "Whether and how to bifurcate trials is a matter left within the sound discretion of the district court."  *Id.*

The Court does not find it economical or efficient to bifurcate the trial into two phases simply because Plaintiff may introduce evidence of Defendant's net worth.  Again, there is no showing that Plaintiff even has evidence of Defendant's net worth, or will introduce anything other than general statements that Defendant is a large banking institution.  Further, the Court may

issue a jury instruction to preclude the jury from considering Defendant's net worth in determining liability or damages other than punitive damages.  This will eliminate any prejudice to Defendant.

Moreover, this case has been pending for over **five years**.  Trial has been delayed repeatedly due to the ongoing COVID-19 public health emergency.  Additionally, trials throughout the district have been delayed, including criminal and civil trials.  To potentially hold two trials in this case when it is unclear Plaintiff even has evidence of Defendant's net worth is not an efficient use of the Court's limited judicial resources.

### IV.   CONCLUSION

For the reasons stated above, the Court GRANTS each of Defendant's *Daubert* motions, GRANTS IN PART AND DENIES IN PART Defendant's motions in limine and DENIES Defendant's motion to bifurcate.

IT IS SO ORDERED.

Dated: November 3, 2020

_____
KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California